# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**DAVID JOHNSON,**
        **Plaintiff,**

**v.**                                     **Case No. 03-C-219**

**ROBERT RIGGS, DEBRA LANCE,**
**RICHARD J. VERHAGEN, and JON E. LITSCHER,**
        **Defendants,**

---

## <u>ORDER</u>

Plaintiff David Johnson, who was formerly incarcerated at the Oakhill Correctional Institution, filed this <u>pro se</u> civil rights action under 42 U.S.C. § 1983. Plaintiff is proceeding <u>in forma pauperis</u> on claims that the defendants violated his right to privacy under the Eighth and Fourteenth Amendments to the United States Constitution. Defendants have filed a motion for summary judgment which will be addressed herein.

## I. BACKGROUND OF THE CASE

On March 17, 2003, plaintiff filed the complaint, in which he set forth an Eighth Amendment deliberate indifference claim and a privacy violation claim. On April 25, 2003, United States Magistrate Judge Aaron E. Goodstein screened the complaint pursuant to 28 U.S.C. § 1915A,[1] dismissing the deliberate indifference claim for failure to state a claim and allowing the privacy claim to proceed.

With respect to plaintiff's privacy claim, the complaint challenges two separate incidents. First, the complaint challenges defendant Sergeant Robert Riggs's manner of

---

[1]Under the statute, the court must dismiss a complaint or any portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b).

distributing medication to plaintiff in July and August 2001, while plaintiff resided on Ward C-9 at Oakhill Correctional Institution and Riggs was the first shift sergeant on Ward C-9. Second, the complaint alleges that, on August 10, 2002, defendant Riggs made offensive comments about plaintiff's sexual orientation and stated that plaintiff "had been involved" with another inmate. (Compl. ¶ IV.A.)

Due to non-consent of the parties, this case was transferred to me on June 11, 2003. Defendants filed a motion to dismiss on July 2, 2003. However, upon plaintiff's request to adjourn this case due to his inability to file a response at that time, I administratively closed the case on July 25, 2003. I further ordered that plaintiff could request that the case be reopened within 90 days. Pursuant to plaintiff's request, this case was reopened on November 5, 2003.

On September 15, 2004, I granted in part and denied in part defendants' motion to dismiss. I dismissed plaintiff's claims for monetary damages against defendants in their official capacities, as well as his claims for injunctive relief because he had been released from prison. I denied defendants' motion to dismiss on qualified immunity grounds, denied defendants Litscher and Verhagen's motion to dismiss for lack of personal involvement, denied defendant Lance's motion to dismiss for absolute judicial immunity in her capacity as inmate complaint examiner, and denied defendants' motion to dismiss pursuant to 42 U.S.C. § 1997(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury").

Defendants filed an answer on October 6, 2004, and a scheduling order was imposed the following day, allowing time for discovery and setting a dispositive motion filing deadline.

On February 7, 2005, defendants filed their motion for summary judgment. This motion is fully briefed and ready for resolution.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." <u>Id.</u>

The party moving for summary judgment bears the initial burden of demonstrating that it is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). The moving party may satisfy its initial burden simply by pointing out that there is an absence of evidence to support the non-moving party's case. <u>Id.</u> at 325. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. <u>Id.</u> at 322-23. Neither party may rest on mere allegations or denials in the pleadings, <u>Anderson</u>, 477 U.S. at 248, or upon conclusory statements in affidavits, <u>Palucki v. Sears, Roebuck & Co.</u>, 879 F.2d 1568, 1572 (7th Cir. 1989).

In evaluating a motion for summary judgement, the court must draw all inferences in a light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). However, it is "not required to draw every

3

conceivable inference from the record – only those inferences that are reasonable." <u>Bank Leumi Le-Israel, B.M. v. Lee</u>, 928 F.2d 232, 236 (7th Cir. 1991).

### III.  FACTS

**A.     Parties**

Plaintiff was an inmate at the Oakhill Correctional Institution ("OCI") at all times relevant to this action.  (Compl. ¶ I.)  Defendant Robert Riggs was a correctional sergeant at OCI, defendant Debra Lance was an inmate complaint examiner at OCI, defendant Richard Verhagen was the warden at OCI, and defendant Jon Litscher was the Secretary of the Wisconsin Department of Corrections ("DOC").  (<u>Id.</u> at ¶ II.)

**B.     July to August 2001 Incident**

Defendant Sergeant Robert L. Riggs has been a Correctional Officer 3 at OCI since approximately 1999.  (Affidavit of Robert L. Riggs [Riggs Aff.] ¶ 2.)  In 2001 and part of 2002, defendant Riggs was the first shift sergeant on Ward C-9 at OCI.  (<u>Id.</u> at ¶ 3.)  In his capacity as first shift sergeant, one of Riggs' responsibilities was to distribute medication to inmates according to their prescriptions.  (<u>Id.</u>)

Defendant Riggs followed a set procedure for distribution of medication to inmates. First, the inmate would come to Riggs's office and ask for the medication.  Second, Riggs would look at the logbook to see when the medication was last dispensed to the inmate and if the medication was supposed to be dispensed at that time.  Third, if it was the correct time to dispense the medication, Riggs would take the medication out of the package and place it directly in the inmate's hand.  Fourth, the inmate would take the medication in front of Riggs with a glass of water.  Fifth, Riggs would have the inmate open his mouth and lift his tongue, and Riggs would inspect his mouth to see if the inmate was hiding the medication

4

in his mouth.  Sixth, Riggs would have the inmate show his hands, and Riggs would make sure the inmate was not hiding the medication in his hands.  Seventh, if it appeared that the inmate did swallow the medication, Riggs would record in the logbook that he distributed the medication to the inmate.  (Id. at ¶¶ 4-5.)

Defendant Riggs would follow the procedure described above with every inmate on Ward C-9 at OCI who was prescribed medication.  (Riggs Aff. ¶ 6.)  Riggs would demonstrate the procedure to the inmate, and he would always explain to new inmates that he distributed medication in a specific way and that he did not deviate from that procedure.  (Id.)

It is the responsibility of the inmate to come to the sergeant to ask for his medication.  (Riggs Aff. ¶ 7.)  It is the responsibility of the first shift sergeant to arrange appointments at the Health Services Unit (HSU) for inmates not taking their medication.  If Riggs noticed that an inmate on Ward C-9 had not taken his medication for several days, Riggs would usually approach the inmate, ask him why he had not taken his medication, and arrange for the inmate to have an appointment at the HSU so that medical staff could reevaluate the inmate's medication.  (Id.)

Plaintiff was placed on Ward C-9 at OCI in approximately June 2001, when defendant Riggs was first shift sergeant on Ward C-9.  (Riggs Aff. ¶ 8.)  Plaintiff had daily medication prescribed to him when he lived on Ward C-9 at OCI.  (Id. at ¶ 9.)  When plaintiff first came to Ward C-9, Riggs demonstrated to him the procedure that Riggs used for distribution of medication.  (Id.)  Riggs also explained to plaintiff that the

same procedure was used for every inmate and that Riggs did not deviate from the procedure. (Id.)

A couple of times when Riggs was administering medication to plaintiff, plaintiff asked Riggs why he had to open his mouth, lift his tongue, and show Riggs his hands when he took his medication. (Riggs Aff. ¶ 10.) Riggs explained that all inmates had to do it that way and that the procedure was not specific to plaintiff. (Id.) Riggs avers that he did not search plaintiff's pockets when administering medication to him. (Id. at ¶ 11.)

Defendant Riggs avers that he often heard plaintiff tell the other inmates on Ward C-9 that plaintiff was bipolar and hard of hearing. (Riggs Aff. ¶ 12.) Plaintiff spoke very loud, and his voice carried. (Id.) Riggs also often heard plaintiff explain to other inmates what bipolar meant and explain that he was on medication because he was bipolar. (Id.) However, plaintiff disputes this. He avers that he never discussed his mental illness with staff or other inmates. (Affidavit of David Johnson [Johnson Aff.] ¶ 3.)

Defendant Riggs knew that plaintiff was prescribed Lithium because that was the name of the medication recorded in the logbook on Ward C-9 for plaintiff. (Riggs Aff. ¶ 13.) Riggs avers that he does not know what Lithium does or what it is prescribed for. (Id. at ¶ 14.)

The parties dispute whether defendant Riggs talked to plaintiff about taking his medication and whether Riggs made an appointment for plaintiff at the HSU. According to Riggs, plaintiff usually took his medication as prescribed while he lived on Ward C-9

at OCI. (Riggs Aff. ¶ 17.) However, on two or three occasions, he stopped taking his medication for several days. (Id.) Riggs avers that per his standard procedure, he talked to plaintiff on those occasions and arranged for him to have an appointment at the HSU to discuss his medication. (Id.) Riggs avers that when plaintiff was not taking his medication while he was living on Ward C-9 at OCI, he would grow disruptive and aggressive. (Riggs Aff. ¶ 18.) Other inmates would approach Riggs at those times and say that plaintiff was acting up and ask Riggs to address the problem. (Id.) Riggs avers that after other inmates approached him about plaintiff's disruptive behavior, he had a conversation with plaintiff about meeting with medical staff to discuss getting back on his medication. (Riggs Aff. ¶ 19.) Riggs did not follow up with the other inmates to inform them that Riggs had discussed the matter with plaintiff. (Id.) When plaintiff acted disruptively or inappropriately with other inmates, Riggs would take plaintiff aside and discuss the matter with him. (Riggs Aff. ¶ 20.) Riggs states that he was always careful not to belittle plaintiff in front of other inmates. (Id.) Riggs denies making any comments to plaintiff about plaintiff being a tutor at school. (Id. at ¶ 21.)

Plaintiff disputes some of these facts, stating:

> I was never disruptive or inappropriate around other inmates nor had I ever received a conduct report for this type of behavior. I was never counseled by Riggs concerning any behavior. I never had a conversation with Riggs regarding my medication other than his statement that "he knows what lithium does." He never arranged to make an appointment for me to see HSU.

(Johnson Aff. ¶¶ 4-7.)

In September 2001, plaintiff filed Offender Complaint OCI-2001-26906 in the Inmate Complaint Review System (ICRS), making the following allegations:

> Between July 23 – August 20, Sgt. Riggs administered Mr. Johnson his medication (Lithium) for a Bipolar disorder. D[ur]ing this time on numerous occasions Sgt. Riggs, loud and in the presence of inmates stated "its time for your drugs – you need a pill," and other embarrassing comments. When Mr. Johnson would receive medication from Sgt. Riggs he would sometimes become loud telling Mr. Johnson to open his mouth, stick out his tongue, put his hands in the air and would search his pockets in front of other inmates. This was not a procedure done with others in the unit.

(Affidavit of Debra L. Lance [Lance Aff.] ¶¶ 6, 23, Ex. 1.) The offender complaint also claimed that defendant Riggs questioned plaintiff's position as a tutor in the school at OCI. (Id.) Defendant Lance, the inmate complaint examiner at OCI, investigated Offender Complaint OCI-2001-26906. (Id. at ¶¶ 8, 23, Ex. 2.)

Defendant Lance conducted an interview with plaintiff about the complaint, during which he elaborated that Riggs also made comments to plaintiff such as "I know what Lithium does." (Id. at ¶ 7, Ex. 2.) After her interview with plaintiff, defendant Lance concluded that defendant Riggs did not violate any work rules and that there were no confidentiality issues raised by the allegations in the offender complaint. (Id. at ¶ 10, Ex. 2.) Defendant Lance recommended that Offender Complaint OCI-2001-26906 be dismissed, with the modification that a copy of the complaint be forwarded to the OCI Security Director for review. (Id. at ¶ 9, Ex. 2.) Lance avers that her recommendation was in no way an attempt to cover up any actions by defendant Riggs. (Id. at ¶ 11.) Ronald K. Malone, former warden at OCI, adopted defendant Lance's recommendation and dismissed Offender Complaint OCI-2001-26906 with modification. (Id. at ¶ 12, Ex. 3.)

Defendant Verhagen was not employed at OCI when Offender Complaint OCI-2001-26906 was filed, and he had no involvement in the investigation of that

8

complaint. (Affidavit of Richard J. Verhagen [Verhagen Aff.] ¶¶ 4-5.) Plaintiff appealed Warden Malone's decision to the corrections complaint examiner, and the appeal was dismissed with the modification that HSU review plaintiff's medication intake and that the OCI Security Director have the allegations of staff actions reviewed. (Lance Aff. ¶ 23, Exs. 4-6.)

Defendant Jon E. Litscher, who was then the secretary of the DOC, did not personally make a decision on Offender Complaint OCI-2001-26906. (Affidavit of Jon E. Litscher [Litscher Aff.] ¶ 6.) Instead, his appointed designee made the Secretary's decision on that offender complaint. (Id.)

C.     August 2002 Incident

On April 20, 2002, third shift Sergeant Ken Newberry was making 3:00 a.m. rounds in Ward C-9 at OCI, checking the inmates' bedrooms, and he discovered plaintiff and his roommate engaged in what appeared to be sexual activity. (Affidavit of James E. Ehlert[2] [Ehlert Aff.] ¶ 4, Ex. 15.) Sergeant Newberry placed plaintiff and his roommate in segregation because of this incident and wrote out major conduct reports, alleging that plaintiff and his roommate had violated Wis. Admin. Code § DOC 303.15, Sexual Conduct. (Id. at ¶ 4, Ex. 15.) After the incident on April 20, 2002, defendant Riggs came in to relieve Sergeant Newberry, and Newberry informed Riggs that he had

---

[2]James E. Ehlert is employed by the DOC as a Registrar at OCI. (Ehlert Aff. ¶ 2.) In his capacity as Registrar, Ehlert is the custodian of the regularly conducted business records of OCI. (Ehlert Aff. ¶ 3.) Records relating to conduct reports and disciplinary actions against plaintiff while he was at OCI are currently maintained at OCI. (Id.)

caught plaintiff and his roommate engaging in sexual behavior and had placed them in segregation. (Id.) (Riggs Aff. ¶ 22.)

Defendant Riggs had nothing to do with plaintiff being placed in segregation because of the April 2002 incident. (Id. at ¶ 23.) Other than Riggs's brief conversation about that incident with Sergeant Newberry after it happened, Riggs avers that he never spoke about the incident with any other staff or inmates at OCI. (Id.) Other inmates approached defendant Riggs about the April 2002 incident, wanting to know what happened. (Id. at ¶ 24.) To every inmate who approached Riggs, Riggs said that he was not there and that he did not know anything about it. (Id.) Riggs avers that he made it clear to the inmates that he did not want to talk about the incident, and that he did not provide them with any information. (Id.)

Shortly after the April 2002 incident, plaintiff was transferred from Ward C-9. (Riggs Aff. ¶ 25.) At the time of plaintiff's transfer, defendant Riggs did not know where he was transferred. (Id.)

In August 2002, defendant Riggs signed up for an eight-hour overtime shift on Ward A-1. (Id. at ¶ 26.) When Riggs arrived for the shift, he discovered that plaintiff was living on Ward A-1. (Id. at ¶ 27.) Until that time, Riggs did not know that plaintiff had been transferred to Ward A-1. (Id.) While working that one shift on Ward A-1, defendant Riggs did not have any interactions with plaintiff. (Id. at ¶ 28.) While working that one shift on Ward A-1, Riggs avers that he never made any comments about plaintiff in the presence of other inmates, about a sexual incident or otherwise. (Id. at ¶ 29.) Defendant Riggs further avers that he never made any statements of a

sexual nature about plaintiff or about any sexual incident involving plaintiff. (Id. at ¶ 30.) Riggs did not work on Ward A-1 again after that one shift in August 2002. (Id. at ¶ 31.) Defendant Riggs had no other interactions with plaintiff while he was at OCI. (Id.)

In August 2002, plaintiff filed Offender Complaint OCI-2002-30050, alleging that, when defendant Riggs worked a shift on Ward A-1, Riggs talked to other inmates in the dayroom about a "sexual incident" between plaintiff and another inmate, using "sexual innuendoes to describe the incident he said Johnson was involved in." (Lance Aff. ¶¶ 13, 23, Ex. 7.) Plaintiff was out walking on the track when this alleged incident occurred, and he did not allege that he himself heard Riggs make any statements about a sexual incident between plaintiff and another inmate. (Id. at ¶ 23, Ex. 7.)

Plaintiff disputes Riggs's averment that Riggs did not make comments of a sexual nature about plaintiff. According to plaintiff:

> On 8/10/02 Robert Riggs a correctional ofc at OCI approached inmates in the day/TV room during a Packer game and began to speak out loud, using offensive language about the sexual orientation of plaintiff and said that plaintiff had been involved with another inmates. Riggs then used vulgar sexual innuendos to describe events. (Exhibits 1). Plaintiff was outside walking the track. When he came back to unit an inmate approached plaintiff [and] told him what Riggs said and stated "be careful because other inmates disapprove of what was said and will hurt you."

(Compl. ¶ IV.A.)[3]

─────────────────────

[3]However, plaintiff presents no affidavit from any inmate who overheard the alleged comments.

Defendant Lance investigated the complaint, meeting with two inmates who claimed to be witnesses to the incident. (Lance Aff. ¶ 15, Ex. 8.) Because the incident involved allegations of staff misconduct, Lance recommended dismissal of the complaint with the modification that the information be forwarded to OCI's security director for investigation pursuant to Administrative Directive 11.5, which governs complaints alleging staff misconduct. (Id. at ¶ 16, Ex. 8.) Defendant Lance's recommendation to dismiss Offender Complaint OCI-2002-30050 and forward the complaint to the security director for investigation was not an attempt to cover up any action by defendant Riggs. (Id. at ¶ 18.)

Defendant Verhagen adopted the recommendation of defendant Lance and dismissed Offender Complaint OCI-2002-30050 with the modification that the information be forwarded to OCI Security Director Jim Parisi for investigation into allegations of staff misconduct pursuant to DOC Administrative Directive 11.5. (Id. at ¶ 19, Ex. 19; Verhagen Aff. ¶ 8.) Defendant Verhagen made this decision based on his review of Offender Complaint OCI-2002-30050 and defendant Lance's recommendation. (Verhagen Aff. ¶ 7.) Plaintiff appealed defendant Verhagen's decision to the corrections complaint examiner, and the appeal was dismissed. (Lance Aff. ¶ 23, Exs. 10-12.) Defendant Litscher would not personally have made any decision on Offender Complaint OCI-2002-30050. (Litscher Aff. ¶ 6.)

OCI Security Director James Parisi received a copy of Offender Complaint OCI-2002-30050 and requested that the administrative captain, Tom Laliberte, investigate the incident. (Affidavit of James A. Parisi [Parisi Aff.] ¶¶ 4-5; Verhagen Aff. ¶ 9.)

Captain Laliberte investigated the incident, interviewing the two inmates who claimed that defendant Riggs made the statements, plaintiff, four other inmates who were in the Ward A-1 dayroom when the incident allegedly took place, and defendant Riggs. (Parisi Aff. ¶ 8, Ex. 13.) The two inmates who claimed that defendant Riggs had made the statements had somewhat inconsistent reports about what Riggs had said. (Id.) Three other inmates who were in the Ward A-1 dayroom at the time of the alleged incident told Captain Laliberte that they never heard defendant Riggs making any statements about plaintiff or about plaintiff's sexual preferences. (Id.) In his interview with Captain Laliberte, defendant Riggs denied ever making any statements about the sexual incident with plaintiff, making any reference to male genitalia, or any other reference to homosexual activity. (Id.)

Because the statements of the two accusing inmates were somewhat inconsistent and contradictory, because plaintiff failed to expound on defendant Riggs' exact statements, and because defendant Riggs denied the incident, Captain Laliberte concluded that Riggs did not make the statements attributed to him in Offender Complaint OCI-2002-30050. (Id.) Based on Captain Laliberte's report, Security Director Parisi concluded that there had been no staff misconduct by defendant Riggs. (Parisi Aff. ¶ 7.)

IV.  DISCUSSION

Defendants contend that 1) plaintiff has failed to state a claim that his Fourteenth and Eighth Amendment rights were violated by disclosure of medical information; 2) they are entitled to qualified immunity from plaintiff's claim that his Fourteenth and

13

Eighth Amendment rights were violated by disclosure of medical information; 3) plaintiff has failed to state a claim that his Fourteenth and Eighth Amendment rights were violated by defendant Riggs's alleged comments about plaintiff's sexual orientation and sexual activity; 4) they are entitled to qualified immunity from plaintiff's claim that his Fourteenth and Eighth Amendment rights were violated by defendant Riggs's alleged comments about plaintiff's sexual orientation and sexual activity; 5) plaintiff cannot recover compensatory damages under the Prison Litigation Reform Act because he has not alleged any physical injury; and 6) defendants Litscher, Verhagen and Lance are protected from liability under 42 U.S.C. § 1983 based on lack of personal involvement.

In response to defendants' motion, plaintiff filed a response brief and an affidavit. The first section of plaintiff's brief appears to be an attempt to dispute several of the defendants' proposed findings of fact. For example, plaintiff asserts:

> 1. Defendant Riggs states that "I do not know what Lithium does or what it is prescribed for" in his affidavit although he also states that he worked for Mendota Mental Health Institution in Madison from 1991-1995. Given the popularity of this medication (Lithium) to treat mental illness and Riggs was assign to a medical unit that had a lot of inmates assign to taking medication (See Exhibit A)

(Pl.'s Resp. to Defs.' Mot. for Summ. J. at 1 ¶ 1.) Plaintiff also describes how defendant Riggs allegedly retaliated against him, however, plaintiff is not proceeding on a retaliation claim in this action. Plaintiff also claims that a Sergeant Beals, who replaced Sergeant Riggs and who is not a defendant in this case, violated plaintiff's constitutional rights. Plaintiff's remaining assertions in this section run along the same lines as those described above. They are either irrelevant or not supported by evidentiary material in the record. See Fed. R. Civ. P. 56(e). Further, plaintiff has failed

to specifically respond to the bulk of defendants' proposed findings of fact as required by Civil L.R. 56.2(b)(1), which allows me to conclude that there is no genuine dispute at to those facts, Civil L.R. 56.2(e).

The argument section of plaintiff's brief is similarly unhelpful to his case. Rather, the section appears to contain random sentences and paragraphs of the law as it relates to privacy. Plaintiff also includes a description of some events that occurred before and after the events alleged in the complaint, which are irrelevant. Finally, plaintiff argues that the defendants Verhagen and Litscher were personally involved based on their failure to investigate and correct Rigg's misconduct.

Upon review of the record, I conclude that plaintiff cannot establish an Eighth or Fourteenth Amendment violation arising out of the July to August 2001 incident, that defendants are entitled to qualified immunity from plaintiff's Fourteenth Amendment claim arising out of the August 2002 incident, and that plaintiff cannot establish an Eighth Amendment violation based on the August 2002 incident. Therefore, I need not address all of defendants' other arguments.

A.      July to August 2001 Incident: Disclosure of Medical Information

Defendants contend that Riggs's alleged statements about plaintiff's medical information did not violate plaintiff's Fourteenth or Eighth Amendment rights.

1.      Fourteenth Amendment

The Supreme Court has recognized a constitutional right to informational privacy under the Fourteenth Amendment. Whalen v. Roe, 429 U.S. 589, 599-600 (1977). In the Seventh Circuit, the right to informational privacy extends to medical information.

<u>Denius v. Dunlap</u>, 209 F.3d 944, 956 (7th Cir. 2000) (stating that "this Circuit has outlined a clearly established 'substantial' right in the confidentiality of medical information"). However, whether "prisoners have any privacy rights in their prison medical records and treatment appears to be an open question" in this circuit. <u>Massey v. Helman</u>, 196 F.3d 727, 742 n.8 (7th Cir. 1999) (citing <u>Anderson v. Romero</u>, 72 F.3d 518, 522-23 (7th Cir. 1995)).

Two circuits in recent years have recognized such a right. <u>See</u> <u>Doe v. Delie</u>, 257 F.3d 309, 317 (3d Cir. 2001) (acknowledging a constitutional right to privacy in one's medical information but stating that such right may be curtailed by policy or regulation shown to be "reasonably related to legitimate penological interests") (citing <u>Turner v. Safely</u>, 482 U.S. 78, 89 (1987)); <u>Powell v. Schriver</u>, 175 F.3d 107, 112 (2d Cir. 1999) (stating that prisoners have the right to maintain confidentiality of previously undisclosed medical information and prison officials can impinge on that right only to the extent that their actions are "reasonably related to legitimate penological interests"). In <u>Delie</u>, the court reasoned that "prison inmates do not shed all fundamental protections of the Constitution at the prison gates." 257 F.3d at 315. Further, because a prison inmate's right to privacy in medical information is not fundamentally inconsistent with incarceration, the prison inmate retains this right upon incarceration. <u>Id.</u> at 317 (citing <u>Powell</u>, 175 F.3d at 112).

However, prisoners cannot enjoy greater privacy protection than individuals in free society, <u>see</u> <u>Carroll v. DeTella</u>, 255 F.3d 470, 472 (7th Cir. 2001), and some amount of sharing of medical information in areas where it might be overheard by

16

others – e.g., in hospital emergency rooms, school infirmaries, and the waiting room of a doctor's office – is commonplace. Further, as the Second Circuit noted, "the interest in the privacy of medical information will vary with the condition." Schriver, 175 F.3d at 111. Delie and Schriver both involved the purposeful dissemination of intensely private medical information about the complaining inmates. See Delie, 257 F.3d at 311 (involving HIV-positive status); Schriver, 175 F.3d at 109 (involving HIV-positive status and transsexualism).

It is undisputed that in his capacity as first shift sergeant one of defendant Riggs's responsibilities was to distribute medication to inmates according to their prescriptions. It is also undisputed that Riggs followed a set procedure for the distribution of medication to inmates and that he would always explain to new inmates that he distributed medication in a specific way and that he did not deviate from that procedure. Plaintiff arrived at OCI's Ward C-9 in approximately June 2001 at which time Riggs demonstrated to plaintiff the procedure used for the distribution of medication. Plaintiff had daily medication prescribed to him.

The parties dispute a portion of the facts as they relate to the distribution of medication to plaintiff. For example, defendant Riggs avers that he heard plaintiff telling other inmates on the unit that plaintiff was on medication because he was bipolar. Plaintiff, on the other hand, avers that he never discussed his mental illness with staff or other inmates. Further, according to Riggs, on several occasions he talked to plaintiff and arranged for him to have an appointment at the HSU because plaintiff had stopped taking his medication for a few days. Riggs also avers that plaintiff

17

became disruptive and aggressive when he stopped taking his medication and that other inmates approached Riggs, telling him that plaintiff was acting up and asking him to address the problem. Plaintiff, however, avers that he was never disruptive or inappropriate around other inmates, was never counseled by Riggs concerning any behavior, and never had a conversation with Riggs regarding medication.

However, these disputes are not material and are notable only to the extent of providing context to plaintiff's claim. Plaintiff claims that defendant Riggs's manner of dispensing plaintiff's medication to him violated plaintiff's right to privacy because Riggs stated loudly, "it's time for your drugs – you need a pill," as well as other embarrassing comments. The relevant issue is whether these actions by Riggs violated plaintiff's constitutional rights.

Plaintiff does not claim that his medical condition, bipolar disorder, was identified in front of other inmates or staff. In fact, plaintiff has not adduced any evidence to show that medical information, sensitive or otherwise, was disclosed. Even if other inmates in the medication line may have overheard Riggs state that it was time for plaintiff to take his pills, this is not the sort of disclosure that would implicate constitutional privacy concerns, in or about of prison. In sum, a reasonable trier of fact could not find that plaintiff's constitutional rights were violated with respect to this

claim. Therefore, defendants' motion for summary judgment as to the Fourteenth Amendment claim will be granted.[4]

### 2. Eighth Amendment

A prison official's "deliberate indifference" to a substantial risk of serious harm to an inmate violates the Eighth Amendment. Farmer v. Brennan, 511 U.S. 825, 828 (1994) (citing Helling v. McKinney, 509 U.S. 25 (1993); Wilson v. Seiter, 501 U.S. 294 (1991); Estelle v. Gamble, 429 U.S. 97 (1976)). A prison official cannot be found liable under the Eighth Amendment "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

In Anderson v. Romero, 72 F.3d 518, 523 (7th Cir. 1995), the court noted in dictum that the cruel and unusual punishment clause of the Eighth Amendment might protect against a state's dissemination of "humiliating but penologically irrelevant details of a prisoner's medical history." The court went on to say,

---

[4]Because plaintiff cannot show that Riggs violated his rights, it follows that his claims against the remaining defendants, which are based on their reactions to what Riggs did, also fail. I also note that plaintiff has failed to present evidence that the other defendants were personally involved in the alleged violation of his rights. He instead argues that they are liable because they became aware of Riggs's conduct and failed to correct it. (Pl.'s Resp. to Defs.' Mot. for Summ. J. at 6-7.) This is insufficient to establish supervisory liability. See Wilson v. City of Chicago, 6 F.3d 1233, 1240-41 (7th Cir. 1993) (stating that failing to eliminate a practice cannot be equated to approving it; instead, deliberate or reckless indifference to complaints must be proved in order to establish that an abusive practice has actually been condoned; neither respondeat superior nor negligent supervision of subordinates is an authorized ground of liability in a suit under § 1983). Further, Verhagen was not employed at OCI when plaintiff filed his ICRS complaint about this incident, and he was not involved in the investigation. Finally, Litscher made no decision on the complaint.

We can imagine, also, that branding or tattooing HIV-positive inmates (the branding of persons who are HIV-positive was once seriously proposed as a method of retarding the spread of AIDS), or making them wear a sign around their neck that read "I AM AN AIDS CARRIER!," would constitute cruel and unusual punishment. So too if employees of the prison, knowing that an inmate identified as HIV positive was a likely target of violence by other inmates yet indifferent to his fate, gratuitously revealed his HIV status to other inmates and a violent attack upon him ensued.

Id.

However, as explained above, plaintiff does not claim that Riggs disseminated "humiliating but penologically irrelevant details of [his] medical history." Anderson, 72 F.3d at 523. Plaintiff does not claim that his medical condition was identified in front of other inmates or staff and has not adduced any evidence to show that medical information, sensitive or otherwise, was disclosed. Plaintiff claims only that Riggs stated loudly, "it's time for your drugs – you need a pill" and other embarrassing comments. A reasonable trier of fact could not conclude that plaintiff's constitutional rights were violated with respect to this claim. Defendants' motion for summary judgment as to the Eighth Amendment claim will be granted.[5]

B.    August 2002 Incident: Comments about Sexual Orientation and Sexual Activity

Defendants contend that plaintiff's second claim must be dismissed because it is based on hearsay. They further contend that even if there was admissible evidence that defendant Riggs had made statements about plaintiff's sexual orientation and sexual activity, such statements do not violate plaintiff's Fourteenth Amendment right to privacy because 1) plaintiff does not have a constitutional right to privacy in

_____

[5]See also n.4, supra.

20

information about his sexual orientation and sexual activity; and 2) plaintiff's claim is, in essence, a claim of defamation, for which there is no constitutional protection. Defendants also contend that even if defendant Riggs had made the statements attributed to him in the complaint, the alleged statements are not the type of harassment that is "objectively, sufficiently serious" to constitute an Eighth Amendment violation. Finally, defendants argue that they are entitled to qualified immunity from plaintiff's claim that his Fourteenth and Eighth Amendment rights were violated by defendant Riggs' alleged comments about plaintiff's sexual orientation and sexual activity.

　　1.　　Fourteenth Amendment

The parties dispute whether defendant Riggs commented on plaintiff's sexual conduct.[6] The April 25, 2003, Screening Order stated that defendant Riggs may have obtained information about plaintiff's sexual orientation from plaintiff's medical records. However, it is undisputed that Riggs learned of the sexual incident from Sergeant Newberry, after he relieved Sergeant Newberry from duty on April 20, 2002. Thus, any privacy considerations with respect to medical records are not implicated here.

_____

[6]In ruling on a motion for summary judgment, I must construe the evidence in a light most favorable to the non-movant, resolving conflicts in his favor. However, defendants contend that plaintiff has presented only hearsay in support of his claim about Riggs's statements. Plaintiff did not hear Riggs's alleged comments, and he has presented no affidavit from anyone who did. Riggs denies under oath that he made the statements alleged. A party opposing summary judgment must rely on evidence that would be admissible at trial. See Fed. R. Civ. P. 56(e). I therefore agree with defendants that plaintiff has failed to set forth any admissible evidence as to what Riggs said. In any event, for the reasons discussed in the text, defendants are entitled to qualified immunity even if Riggs did discuss plaintiff's sexuality.

In the screening order, the court explained that plaintiff may have stated a claim for violation of the right to privacy when Riggs released information to the general population regarding plaintiff's sexual activity and/or sexual orientation.[7]  To the extent that plaintiff is claiming that Riggs violated his right of privacy when he disclosed plaintiff's sexual orientation and sexual activity his claim fails because Riggs is protected by qualified immunity.  When government officials perform discretionary functions, they are entitled to a qualified immunity defense that shields them from damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In assessing whether a defense of qualified immunity is applicable, the court must address two questions.  Saucier v. Katz, 533 U.S. 194 (2001).  The threshold question is whether, "[t]aken in the light most favorable to the party asserting the injury," the "facts alleged" show that the officer's conduct violated a constitutional right.  Id. at 201.  In the event that no constitutional right would have been violated if the allegations were established, there is no need for further analysis of the qualified immunity issue.  Id.

However, if a constitutional violation could be demonstrated based on a favorable view of the parties' submissions, the analysis proceeds to the second step, which requires that the court determine whether the right was clearly established.  Id.  Such inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  Id.  "The relevant, dispositive inquiry in determining whether a right is clearly

---

[7]Plaintiff denies that he is homosexual.  Plaintiff states that he is heterosexual and that Riggs "concluded from the reports that . . . plaintiff was homosexual, and attempted to cause harm to the plaintiff by disclosing this information to the inmates."  (Resp. to Defs.' Mot. for Summ. J. at 7.)  Regardless of whether he is homosexual, it is undisputed that plaintiff engaged in homosexual activity in prison.

established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. [If] the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Id. at 202; see also Malley v. Briggs, 475 U.S. 335, 341 (1986) (stating that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

Turning to the first question, plaintiff has asserted a violation of a constitutional right. The Unites States Supreme Court has recognized an implied right to privacy inherent in the Constitution, but the right is not clearly delineated. See Griswold v. Connecticut, 381 U.S. 479 (1965). There are two generally recognized privacy interests: the "interest in independence in making certain kinds of important decisions" and the "interest in avoiding disclosure of personal matters." Whalen v. Roe, 429 U.S. 589, 599-600 (1977). The former interest protects the right to participate in private activities such as consensual intercourse. Lawrence v. Texas, 539 U.S. 558 (2003). The latter interest, the right to "informational privacy," Greenville Women's Clinic v. Comm'r, S.C. Dep't of Health, 317 F.3d 357, 359 (4th Cir. 2002), may be implicated when information concerning an individual's sexual matters or his body and health are disclosed. See Whalen, 429 U.S. at 602 (medical information); Eastwood v. Department of Corrections, 846 F.2d 627, 631 (10th Cir. 1988) (sexual history). The "interest in avoiding disclosure of personal matters" is implicated in the present case.

In Sterling v. Borough of Minersville, the Third Circuit considered whether there exists a right to privacy preventing the disclosure of one's sexual orientation. The court concluded that the plaintiff had a constitutional right not to have his homosexuality disclosed. 232 F.3d 190, 196 (3d Cir. 2000). The court explained that "sexual orientation [i]s an intimate aspect of [plaintiff's] personality entitled to privacy protection" and that "[i]t is difficult to imagine a more private matter than one's sexuality." Id. I agree. Thus, construing the facts in the light

23

most favorable to plaintiff, plaintiff has asserted a violation of his right to privacy. Moreover, although a prisoner retains only those rights that are "not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrective system," Pell v. Procunier, 417 U.S. 817, 822 (1974), defendants' have not pointed out any, nor can I come up with any, legitimate penological objectives that would require the disclosure to other inmates of plaintiff's homosexuality or sexual conduct.

I now turn to the question of whether, in August 2002, this constitutional right was clearly established. As of 2002, only two circuits had ruled on whether a disclosure of a person's sexual orientation violated the right to privacy. In Walls v. City of Petersburg, the Fourth Circuit reached the opposite conclusion reached by the Third Circuit in Sterling. 895 F.2d 188 (4th Cir. 1990). The Fourth Circuit concluded that information about whether a person engaged in homosexual activity was not protected by the right to privacy. Id. at 193 (concluding that there was no bar to a police questionnaire asking about the applicant's sexual orientation); see also Ingrid Schupbach Martin, The Right to Stay in the Closet: Information Disclosures by Government Officials, 32 Seton Hall L. Rev. 407, 409-10 (2002) (suggesting that the Third Circuit's decision that a person has a constitutional right not to have his homosexuality disclosed "is not as inevitable as the court's opinion suggests"). As explained previously, qualified immunity "operates to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful." Hope v. Pelzer, 536 U.S. 730 (2002) (internal quotation and citation omitted). Thus, if the Seventh Circuit has not decided a particular issue and other circuits have reached conflicting outcomes, the right at issue is not clearly established. See Donovan v. City of Milwaukee, 17 F.3d 944, 953 (7th Cir. 1994) ("Because only two circuits had considered cases on point, reaching opposite results, we conclude that the relevant case law was still developing [and] the key issue in this case had

not been clearly settled. ") (internal quotation omitted); see also Wilson v. Layne, 526 U.S. 603, 618 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."). Accordingly, because the Seventh Circuit had not ruled on the issue as of 2002 and other circuits reached conflicting outcomes, I cannot conclude that the right to privacy protecting from disclosure plaintiff's sexual orientation and sexual activity was clearly established in 2002. Thus, Riggs is entitled to qualified immunity.[8]

Finally, to the extent that plaintiff is claiming that Riggs' disclosure of his sexual orientation and sexual activity is defamatory, his claim must fail. Slander and defamation are not actionable under a constitutional tort theory. Hernandez v. Joliet Police Dep't, 197 F.3d 256, 262 (7th Cir. 1999) (citing Paul v. Davis, 424 U.S. 693, 702 (1976)). There is "no constitutional doctrine converting every defamation by a public official into a deprivation of liberty. . . ." Paul, 424 U.S. at 702; see also DeWalt v. Carter, 224 F.3d 607, 612 (7th Cir. 2000) ("Standing alone, simple verbal harassment does not . . . deprive a prisoner of a protected liberty interest . . . "). Thus, defendants' motion for summary judgment on this claim will be granted.

**2.     Eighth Amendment**

"The Eighth Amendment forbids cruel and unusual punishments; it does not require the most intelligent, progressive, humane, or efficacious prison administration." Anderson, 72 F.3d at 524. "[N]ot every psychological discomfort a prisoner endures amounts to a

_____

[8]As discussed, because plaintiff's claims against the other defendants are based on their reactions to Riggs's conduct, those claims must fail as well. See also n.4, supra. And, it is undisputed that Litscher made no decision on plaintiff's inmate complaint about this incident.

constitutional violation." <u>Calhoun v. DeTella</u>, 319 F.3d 936, 939 (7th Cir. 2003). In order to state a claim for a violation of the Eighth Amendment, plaintiff must state that the deprivation is "objectively, 'sufficiently serious.'" <u>Farmer</u>, 511 U.S. at 834. In other words, "a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." <u>Id.</u> Isolated incidents of harassment are usually not severe enough to satisfy this standard.

For example, in <u>DeWalt</u>, 224 F.3d at 612, the court concluded that the plaintiff prisoner's claims that correctional officers violated his Eighth and Fourteenth Amendment rights by directing racially derogatory and sexually explicit language at him were properly dismissed. In that case, the correctional officers directed their comments at the plaintiff prisoner, whereas in this case plaintiff heard about defendant Riggs' alleged comments from other inmates. Nevertheless, I find <u>DeWalt</u> to be instructive to the resolution of this case. "Standing alone, simple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the laws." <u>Id.</u> Thus, even if, as plaintiff claims, defendant Riggs did tell other inmates that plaintiff was involved in a sexual incident with another inmate, that action standing alone does not implicate the Eighth Amendment. Whether defendant Riggs talked about plaintiff directly or talked about plaintiff to another, in this case, is a distinction without a difference as far as the Eighth Amendment goes. Thus, defendants' motion for summary judgment on this claim will be granted.[9]

---

[9]Even if plaintiff could demonstrate a violation of his Eighth Amendment rights based on this claim, he has not shown that such right was clearly established at the time. Thus, in the alternative, defendants would be entitled to qualified immunity. <u>See also</u> n.4, <u>supra</u>.

## V.  CONCLUSION

**THEREFORE, IT IS ORDERED** that defendants' motion for summary judgment (Docket #35) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment dismissing the plaintiff's claims and this action.

Dated at Milwaukee, Wisconsin, this 15th day of September, 2005.

_s/Lynn Adelman_____
LYNN ADELMAN
U.S. District Judge

Case 2:03-cv-00219-LA   Filed 09/15/05   Page 27 of 27   Document 49